**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| **TAMEKA BUCKHANAN,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case number 4:13cv1038 CAS** |
| ) | **TCM** |
| **CAROLYN W. COLVIN, Acting** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This 42 U.S.C. §§ 405(g) and 1383(c)(3) action for judicial review of the final

decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner),

denying the application of Tameka Buckhanan (Plaintiff) for supplemental security income

("SSI") under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b, is

before the undersigned Magistrate Judge for a review and recommended disposition. See 28

U.S.C. § 636(b).

**Procedural History**

Plaintiff applied for SSI in July 2010, alleging she was disabled as of the beginning

of that year by severe depression, alcoholism, and a dislocated right shoulder. (R.[1] at 146-49,

182.) Her application was denied initially and following a March 2012 hearing before

Administrative Law Judge ("ALJ") Kenneth G. Biskup. (Id. at 7-20, 25-81.) The Appeals

---

[1]References to "R." are to the administrative record filed by the Commissioner with her
answer.

Council denied Plaintiff's request for review of the ALJ's decision, effectively adopting that decision as the final decision of the Commissioner. (<u>Id.</u> at 1-3.)

## **<u>Testimony Before the ALJ</u>**

Plaintiff, represented by counsel, and Gerald D. Belchick, Ph.D., testified at the administrative hearing. (R. at 25-74.) On the day of the hearing, Plaintiff amended her alleged onset date to be June 22, 2010. (<u>Id.</u> at 30.)

Plaintiff was thirty-six years old at the time of the hearing. (<u>Id.</u> at 30.) She is 5 feet 5 inches tall, currently weighs 130 pounds, and usually weighs between 140 and 145 pounds. (<u>Id.</u> at 31.) She has lost weight because she is depressed and not eating. (<u>Id.</u>) She is right-handed. (<u>Id.</u>) She left school after the eleventh grade because she did not like it and it was violent. (<u>Id.</u> at 31-32.) She completed the training to become a certified nurse assistant, but no longer was certified. (<u>Id.</u> at 32.) She does not have any trouble reading and writing. (<u>Id.</u>) She moved in with her mother in September 2009. (<u>Id.</u> at 56.)

Asked how long she worked at Pro-Rehab, Plaintiff replied six months to a year. (<u>Id.</u> at 32.) She could not remember. (<u>Id.</u>) She left because she had a baby. (<u>Id.</u> at 33.) She briefly worked as a teacher's assistant at a day care. (<u>Id.</u>) She left that job because she was also leaving her husband. (<u>Id.</u> at 35.) She worked for a month or two at Community Manor in 2005, but left because of depression. (<u>Id.</u>) She made outgoing telephone calls for a marketing company in 2006. (<u>Id.</u> at 35-36.) In 2011, she worked for one month at a daycare and learning center. (<u>Id.</u> at 36.) She was fired because she could not stand for long periods of time and, consequently, had to do most of her work sitting on the floor, which the one and

two year old children did not like. (Id.) She worked for two or three months for a temporary service, but had to quit because her left leg was painful. (Id. at 37.) She has not looked for work since. (Id.)

Asked what medical problems prevent her from working, Plaintiff explained that she has sciatic nerve damage, a dislocated left shoulder, and depression. (Id. at 38, 44.) Her nerve damage prevents her from doing activities she formerly enjoyed, e.g., skating and swimming. (Id. at 38.) She has spinal injections every two weeks; their effect wears off three days before she is due to have another one. (Id. at 38-39.) The damage also prevents her from standing for longer than thirty minutes or walking for long periods of time. (Id. at 39-40.) She was in a motor vehicle accident the previous October; the accident aggravated her pre-existing back pain. (Id. at 40.) She can sit for long periods if she leans forward. (Id. at 41.) Laying down is painful. (Id.) In addition to the injections, Plaintiff takes Vicodin[2] for her back pain. (Id. at 43.) It has no side effects. (Id. at 44.)

Because of her anxiety and depression, she gets dizzy. (Id. at 42.) This happens every day and started six months earlier. (Id. at 42, 43.) She was diagnosed with depression in 2010, and also with post-traumatic stress disorder ("PTSD"). (Id. at 49.) Because of the depression, she cannot sleep well, is "going through a horrible divorce," was beaten by her husband, and is not permitted by her husband to see the two of her children who live with him. (Id. at 49-50.) This prohibition is not court-ordered but is because he will not bring the

_____

[2]Vicodin, a combination of acetaminophen and hydrocodone, is used to relieve moderate to severe pain. Vicodin, http://www.drugs.com/vicodin.html (last visited June 18, 2014).

children to see her and she does not have the means of transportation to go see them.  (Id.) 50.)  Their fifteen-year old son lives with her.  (Id. at 52-53.)  Also because of her depression, she sometimes does not get out of bed for two to four days.  (Id. at 50-51.)  Because of the dizziness caused by anxiety, she fainted one time at the job.  (Id. at 51.)  Her anxiety attacks happen every day for ten to fifteen minutes each time.  (Id. at 52.)  Plaintiff takes sertraline for depression and trazodone to help her sleep.  (Id. at 53.)  Her doctor will not prescribe her any medication for anxiety because she is a recovering alcoholic.  (Id.)

Plaintiff also has problems with her left shoulder.  (Id. at 44.)  She does not have any insurance to cover treatment for it anymore.  (Id. at 44, 47.)  She is on Medicaid, but she understands it will not cover the needed treatment for her shoulder.  (Id. at 48-49.)  The shoulder hurts if she reaches overhead.  (Id. at 45.)  On one occasion, she dislocated her right shoulder.  (Id. at 46.)

Plaintiff last saw her primary care physician, Dr. Gallagher,[3] in November 2011.  (Id. at 54.)  She sees Dr. Padda[4] for the back injections and is "overwhelmed with him."  (Id.)  She does not have a reason to see Dr. Gallagher.  (Id.)

The trazodone helps her sleep; the other medications have no effect.  (Id. at 55.)

Plaintiff has been in rehabilitation and has not had a drink since November 18, 2010.  (Id. at 56-57.)  She goes to AA meetings twice a week.  (Id. at 57.)

---

[3]As noted below, see page 12, infra, Ms. Gallagher is a nurse practitioner.

[4]The transcript refers to Dr. "Peta"; the correct spelling is "Padda."

Her mother does the grocery shopping.  (Id. at 60.)  Friends and family come visit her.  (Id. at 61.)  She has a visitor every day.  (Id.)  With the exception of occasionally washing dishes, cooking, and folding clothes, she does not do any household chores.  (Id. at 61-62.)

Dr. Belchick, testifying without objection as a vocational expert ("VE"), described Plaintiff's work as a teacher's assistant at a day care center as being at the medium exertional level if the children are of pre-school age and at the light level if they are infants.  (Id. at 66.)  It was a semi-skilled occupation with a specific vocational preparation ("SVP") level of three.[5]  (Id. at 67.)  He was then asked to assume a claimant of Plaintiff's age and education with no vocationally relevant work history and no exertional restrictions.  (Id.)  This claimant was limited to unskilled work with simple routine tasks dealing primarily with things rather than with people.  (Id.)  She could occasionally relate to co-workers and supervisors.  (Id.)  The VE testified that this claimant can perform work as a housekeeper, as an assembler, and as a kitchen helper.  (Id. at 68.)  These jobs exist in significant numbers in the national and local economies.  (Id.)

Asked to assume the hypothetical claimant was limited to sedentary work in addition to the other restrictions, the VE testified that this claimant can perform the assembly job, a

---

[5]"The SVP level listed for each occupation in the [*Dictionary of Occupational Titles*] connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance.  At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* [DOT] app. C at 1009 (4th ed. 1991)." **Hulsey v. Astrue**, 622 F.3d 917, 923 (8th Cir. 2010).  An occupation with an SVP level of three requires more than one month up to and including three months.  DOT app. C at 1009.

cashiering II job, and a bench packaging job.  (Id. at 69.)  These jobs also exist in significant numbers in the national and local economies.  (Id. at 69, 70.)

The VE next testified that one absence a month is "about all that's tolerated in the unskilled area."  (Id. at 70.)  And, if someone was unpredictable in terms of their work and would leave the workstation ten percent of the workday, that person could not maintain employment, "particularly at the unskilled level."  (Id. at 71.)

He stated that his testimony does not conflict with the DOT.  (Id. at 70.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's application, records from health care providers, and assessments of her mental abilities.

When applying for SSI, Plaintiff completed a Disability Report, disclosing that she stopped working on January 1, 2010.  (Id. at 182.)  She stopped then because she was let go after she refused to sign a write-up.  (Id.)

Plaintiff also completed a Function Report.  (Id. at 206-12.)  Asked to describe what she does during the day, she replied that she brushes her teeth, eats breakfast, checks her schedule, and, if nothing is planned, stays home and writes in her journal or watches television.  (Id. at 206.)  She skips meals because she is not hungry.  (Id.)  She lives with her aunt and does not take care of anyone else or of any pets.  (Id. at 207.)  She has difficulty sleeping and can go days without sleep.  (Id.)  Once or twice a week, she bathes.  (Id.)  She needs to be reminded to bathe and comb her hair.  (Id. at 208.)  She does not need to be

reminded to take her medication. (Id.) After she almost burned the house down when she fell asleep while cooking, she does not prepare her own meals. (Id.) She does not like to be alone. (Id. at 209.) Her hobbies include writing and reading. (Id. at 210.) She talks on the telephone with people or they come visit her. (Id.) Her impairments adversely affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, understand, follow instructions, use her hands, and get along with others. (Id. at 211.) She does not handle stress or changes in routine well. (Id. at 212.) She wears glasses. (Id.)

A friend who has known Plaintiff for three years completed a Function Report Adult – Third Party form on her behalf. (Id. at 218-25.) They talk and watch television everyday. (Id. at 218.) Asked what Plaintiff does during the day, the friend replied that she does not see her do anything, with the possible exception of talking on the telephone. (Id.) The friend reported that Plaintiff has to be constantly reminded by family members about appointments and errands. (Id. at 222.) She sometimes becomes very agitated and argumentative. (Id.) She will start a task and then stop and do something else. (Id. at 223.) Plaintiff's impairments adversely affect her abilities to lift, understand, use her hands, follow instructions, see, complete tasks, concentrate, remember, and get along with others. (Id.) She was fired from a job at Family Dollar for refusing to sign a write-up. (Id. at 224.) She has nightmares when she tries to sleep and is beginning to have panic attacks. (Id.)

Plaintiff's aunt also completed a Function Report Adult – Third Party form for her. (Id. at 228-35.) She reported that Plaintiff moves from relative to relative and has no

permanent residence because of her behavior problems. (Id. at 228.) During the day, she slams doors, cries, makes suicide threats, and engages in violent behavior. (Id.) She suffers from insomnia. (Id. at 229.) She constantly needs to be reminded to take care of her personal needs and grooming. (Id. at 230.) She does not complete chores because she is easily distracted. (Id.) Her impairments adversely affect her abilities to understand, follow instructions, complete tasks, remember, concentrate, and get along with others. (Id. at 233.) She has no respect for authority. (Id.) She was fired from a job for yelling. (Id. at 234.)

The relevant few medical records before the ALJ are summarized below in chronological order and begin in August 2009 when Plaintiff was seen at the St. Alexius Hospital emergency room with complaints of constant right shoulder pain resulting from an injury she sustained when she rolled over in bed. Id. at 292-307.) It was noted that she had a history of shoulder dislocations. (Id. at 302.) She was given Toradol[6] and intravenous ("IV") doses of morphine. (Id. at 297.) X-rays revealed an anterior displacement of the right humeral head – a dislocated right shoulder. (Id. at 296, 298.) She underwent a closed reduction of the right shoulder, a reduction that was described as going "easily without incident." (Id. at 295, 298, 303.) Subsequent x-rays were normal. (Id. at 298.) Plaintiff was discharged home in stable condition and with a prescription for Ultram[7] and instructions to

---

[6]Toradol is a nonsteroidal anti-inflammatory drug used to treat moderate to severe pain. Toradol, http://www.drugs.com/toradol.html (last visited June 23, 2014).

[7]Ultram "is a narcotic-like pain reliever . . . used to treat moderate to severe pain." Ultram, http://www.drugs.com/ultram.html (last visited June 19, 2014).

follow-up with the physician, Dr. Benjamin Crane.  (Id. at 298, 305.)  She was released to return to work on August 20.  (Id. at 307.)

The next medical record is of Plaintiff's February 2010 visit to the St. Alexius Hospital emergency room early in the morning for complaints of a constant, throbbing headache that was aggravated by movement and alleviated by nothing.  (Id. at 260-74.)  The headache had begun suddenly the night before.  (Id. at 265.)  The pain was a ten on a ten-point scale.  (Id. at 269.)  She binged on alcohol on the weekend.  (Id. at 265.)  On examination, Plaintiff appeared to be severely depressed and in obvious pain.  (Id.)  She was oriented to person, place, and time; was focused and able to follow commands; and had intact recent memory.  (Id.)  She had full strength in all extremities, a normal gait, normal sensation, and no back pain.  (Id.)  She did not display any inappropriate behavior.  (Id.)  A computed tomography ("CT") scan of her head was normal. (Id. at 274.)  She was given IV doses of Toradol and of Phenergan,[8] diagnosed with a tension headache, and discharged home within two hours with a shoulder immobilizer and a prescription for Midrin[9] to be taken every four to six hours as needed.  (Id. at 265, 271, 273.)

In March, Plaintiff returned to the St. Alexius Hospital emergency room with complaints of a headache located in the forehead and left side of the forehead.  (Id. at 275-

---

[8]Phenergan is also an antihistamine.  Phenergan, http://www.drugs.com/phenergan.html (last visited June 19, 2014).

[9]Midrin is a combination of acetaminophen, dichloralphenazone, and isometheptene and is used to treat migraine or tension headaches.  Midrin, http://www.drugs.com/mtm/midrin.html (last visited June 23, 2014).

91.)  The headache was aggravated by drinking beer and alleviated by nothing.  (Id. at 275.)

On examination, she was as when last seen, with the exception of having a limited range of

motion in her extremities.  (Id. at 281.)  She had full strength in her extremities and a normal

gait.  (Id.)  The headache pain was a ten on a ten-point scale.  (Id. at 284.)  Plaintiff reported

that she had a follow-up appointment on March 9, but could not wait that long.  (Id.)  She

was given IV doses of Compazine[10] and Benadryl, an antihistamine, and diagnosed with a

headache.  (Id. at 281, 283, 285, 289.)  Within two hours, she was discharged home in stable

condition and with instructions to stop drinking beer until her headaches were evaluated

further.  (Id. at 282, 285.)

In January 2011, Erin Bostick, M.A., L.P.C.,[11] diagnosed Plaintiff with alcohol

dependence and PTSD.  (Id. at 339.)  Plaintiff's current Global Assessment of Functioning

("GAF") was 65[12]; her anticipated GAF in six months was 75.[13]  (Id.)

---

[10]Compazine is used to treat, among other things, anxiety.  Compazine, http://www.drugs.com/mtm/compazine.html (last visited June 23, 2014).

[11]Licensed Professional Counselor.

[12]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis omitted).

[13]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ."  DSM-IV-TR at 34.

Shortly thereafter, Plaintiff was seen by a provider[14] at Preferred Family Health Care. (Id. at 337-38.) She reported that she had been treating her depression with alcohol. (Id. at 337.) She was sexually abused as a child, physically abused by her ex-husband, and sodomized by strangers in 2008. (Id.) Consequently, she had nightmares, flashbacks, and panic attacks; she was hyper-vigilant. (Id.) She reported she had been diagnosed with PTSD, but had not been prescribed any medications. (Id.) She denied any history of suicide attempts. (Id.) She had last had a drink the previous Thanksgiving. (Id. at 338.) She had an eleventh grade education, was working on her General Equivalency Degree ("GED"), and was going through a divorce. (Id.) On examination, Plaintiff was alert and oriented to time, place, and person; had good grooming, hygiene, and eye contact; was pleasant and cooperative; and had adequate insight and judgment. (Id.) Her speech was within normal limits. (Id.) Her mood was "'down.'" (Id.) She was anxious. (Id.) She was prescribed a medication (the name is illegible) to stop drinking. (Id.) Plaintiff was diagnosed with PTSD; major depressive disorder without psychotic features; and alcohol dependence. (Id.) Her current GAF was 55.[15] (Id. at 339.) She was prescribed sertraline and trazodone. (Id.) It was noted that Plaintiff would need counseling and also noted that Plaintiff stated that she

---

[14]The name is illegible.

[15]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

was receiving counseling from a different provider.  (Id.)  Plaintiff was to return in two weeks or as needed.  (Id.)

In April, Plaintiff was seen by Judith Gallagher, N.P., at Grace Hill South Health Center ("Grace Hill") for a hepatitis A injection.  (Id. at 342-43.)  No other problems were noted.  (Id.)

In November, Plaintiff returned to Ms. Gallagher for complaints of pain and for a physical needed for work.  (Id. at 344-46.)  Plaintiff explained that she had been diagnosed three weeks earlier with sciatica when she was treated in an emergency room and had been diagnosed with myofascial strain when seen in an emergency room on October 29 following a motor vehicle accident.  (Id. at 344.)  Her last alcoholic drink was nine months ago.  (Id.) Her medications included only Celexa, an antidepressant.[16]  (Id.)  On examination, she was tender in her lower back and abdomen.  (Id. at 345.) Otherwise, the examination was normal. (Id.)  Plaintiff was diagnosed with low back pain and was to follow-up with the pain clinic as scheduled.  (Id.)  Her prescription for Celexa was renewed.  (Id.)  A tuberculosis screening and blood pressure check were performed two days later.  (Id. at 347-48.)  It was noted then that Plaintiff had not kept her pain management appointment.  (Id. at 347.)

Plaintiff was seen at the Center for Interventional Pain Management ("CIPM") on December 2 for left leg and buttock pain.  (Id. at 351, 354, 386-87.)  Straight leg raises were

---

[16]See Celexa, http://www.drugs.com/celexa.html (last visited June 24, 2014).

positive on the left.[17] (Id. at 386.) Waddells testing was negative.[18] (Id.) Gurpreet S. Padda, M.D., noted that Plaintiff had positive dural stretch signs with dense hypoesthesia[19] at left L4-L5 and L5-S1. (Id. at 351.) She also had paraxial extension low back pain with severe paraspinous spasticity. (Id.) A subsequent magnetic resonance imaging ("MRI") revealed (1) a moderate to large sized left-sided disc protrusion at L5-S1 impinging on the left S1 nerve root and causing a central canal narrowing on the left side and a mild left inferior neural foraminal narrowing and (2) additional degenerative disc disease at L4-L5 with facet arthropathy at L3-L4 and L4-L5. (Id. at 352-53, 358-59.)

Plaintiff returned to CIPM two weeks later. (Id. at 384-85.) She had a normal gait and normal appearance. (Id.)

When completing a CIPM intake form on January 3, 2012, Plaintiff answered "Yes" to questions whether she had low back pain that radiated into her legs; had "'numbness,' 'burning,' 'tingling,' or a 'pins and needles' sensation in [her] arms, hands, feet, or legs"; had experienced weakness in her arms and/or legs; and had been awakened at night by

---

[17]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

[18]"Waddell signs are a group of 8 physical findings, . . . the presence of which has been alleged at times to indicate the presence of secondary gain and malingering." Fishbain, DA, et al., Is there a relationship between nonrganic physical findings (Waddell signs) and secondary gain/malingering?, http://www.ncbi.nlm.nih.gov/pubmed/15502683 (last visited June 24, 2014).

[19]Hypoesthesia is a synonym for hypesthesia, which is "[a]bnormal acuteness of sensitivity to touch, pain, or other sensory stimuli." Stedman's Medical Dictionary, 824, 835 (26th ed. 1995).

- 13 -

"'numbness and tingling'" in her hands.  (Id. at 269-71.)  On a scale from one to ten, with ten

being the worst, her pain was a seven and one-half when she was on medication.  (Id. at 370.)

Dr. Padda noted the MRI results and results of a nerve conduction study and an

electromyogram ("EMG"), each performed on her left lower extremity.  (Id. at 355-57.)  The

study and EMG were normal.  (Id. at 357.)

Ten days later, Plaintiff was given a selective nerve root block injection at L4-L5 and

L5-S1.  (Id. at 363-64, 380-83.)  Her diagnoses included lumbosacral spondylolysis without

myelopathy; lumbar disc displacement; degenerative disc disease; lumbar radiculopathy; and

back pain/lumbago.  (Id. at 363.)

The injection was repeated two weeks later and again on February 14.  (Id. at 360-62,

372-79.)  On February 29, Plaintiff had an epidural steroid injection in her lumbar spine.  (Id.

at 349-50, 365-68.)  As before, her gait was normal; straight leg raises were positive on the

left.  (Id. at 365-66.)  The only diagnosis was lumbosacral spondylolysis without myelopathy.

(Id. at 349.)

Also before the ALJ were assessments of Plaintiff's mental impairments.

In September 2010, Plaintiff underwent a psychological evaluation by Marva M.

Robinson, Psy.D., a licensed psychologist.  (Id. at 314-19.)  Dr. Robinson noted that

"[Plaintiff] presented with a scarf on her head, labile mood, and with a strong odor of alcohol

on her person.  When confronted if she was sober, she reported she was sober, but reported

having her last alcoholic beverage one hour before her appointment.  It was observable that

she might have been slightly inebriated."  (Id. at 314.)  Plaintiff named depression as her chief

complaint and acknowledged alcoholism had been a problem. (Id.) Her depression had begun in approximately 2007 when her husband had an affair with her close friend. (Id.) She has not been in contact with him since then. (Id.) Their three children, all boys, stayed with their father after the separation because she could not care for them. (Id. at 314-15.) She lived with her mother and sister, had no social life, and was "consumed with depression all day, every day." (Id. at 315.) She became even more depressed after being robbed and raped in September 2008. (Id.) Since the attack, she is paranoid and thinks someone is watching her. (Id.) She had seen a counselor twice, and had then stopped. (Id.) She had a history of alcoholism since 2002. (Id.) She had been sober in 2008 for eight months. (Id.)

Plaintiff summarized her past medical history as being the three emergency room visits at St. Alexius Hospital. (Id.) She had a twelfth grade education. (Id. at 316.) She was seeking alimony and child support and, on the advice of her attorney, had quit her job with Dollar General. (Id.) "She reported that she is able to work, but is not doing so because she was advised to remain unemployed." (Id.) She "gets jittery and nervous before her first drink." (Id.)

On examination, she initially had a "lackadaisical attitude, but at the end of the evaluation repeatedly asked the evaluator if she would be 'given money . . . .'" (Id.) She made appropriate eye contact, but often had a labile affect and would give "vague and irrelevant information." (Id.) She was energetic one moment and sullen the next. (Id.) She was able to relate appropriately. (Id. at 317.) She had to be redirected in order to give clear answers and more detail. (Id.) For instance, her initial report of drinking was that she had

not done so in a long time.  (Id.)  When confronted about the smell of alcohol, she then stated that she had had a wine cooler the night before.  (Id.)  When later asked again about her drinking, she reported having a drink an hour before her interview.  (Id.)  She had an appropriate rate of speech, had some tangents but they were not illogical, and had no flight of ideas.  (Id.)  "She reported [a] depressed mood, and displayed a full range of affect from depressed to upbeat."  (Id.)  She described visions of running her husband over with a car, but denied wanting to do so.  (Id.)  She "endorsed having every possible psychotic example given, but was unable to give clear examples."  (Id.)  She reported having thoughts of wanting to harm herself, staying in a dark room, and eating only one snack a day.  (Id.)  Her remote and recent memory were intact.  (Id.)  She was oriented to person, place, and time, and could recall recent events.  (Id.)  She could do basic addition and subtraction problems.  (Id.)  "Her insight into her mental illness appeared more exaggerated than her observed symptoms."  (Id. at 318.)  She had poor judgment; for instance, she was seeking child support although her children lived with their father and she had not contacted them in more than a month.  (Id.)  She went to church, read, and cooked, but did not go grocery shopping or do household chores.  (Id.)  She reported she did not have any social activities; she watched television with her mother and sister.  (Id.)  She reported needing assistance in caring for her personal needs because she lacked motivation.  (Id.)  She did not attempt any concentration tasks.  (Id.)  Her pace during the interview was appropriate.  (Id.)

Dr. Robinson diagnosed Plaintiff with alcohol dependence and alcohol-induced mood disorder.  (Id.)  Her current GAF was 75.  (Id.)  She appeared "physically able to work with treatment for alcoholism."  (Id. at 319.)

The next month, a Psychiatric Review Technique form was completed by a non-examining consultant, Kyle DeVore, Ph.D.  (Id. at 322-33.)  Plaintiff was described as having an affective disorder, i.e., alcohol-induced mood disorder, and substance addiction disorder, i.e., alcohol dependence.  (Id. at 322, 325, 328.)  These disorders resulted in Plaintiff experiencing mild difficulties in social functioning and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 330.)  She did not have any restrictions in activities of daily living and had not had any repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment, Dr. DeVore assessed Plaintiff as not being significantly limited in two of the three abilities in the area of understanding and memory and moderately limited in one, i.e., her ability to understand and remember detailed instructions. (Id. at 334.)  In the area of sustained concentration and persistence, Plaintiff was moderately limited in two of the ten listed abilities:  her abilities to (1) carry out detailed instructions and (2) maintain attention and concentration for extended periods.  (Id. at 334-35.)  She was not significantly limited in any of the five abilities listed in the area of social interaction.  (Id. at 335.)  In the area of adaptation, Plaintiff was not significantly limited in three of the four listed abilities and was moderately limited in one – her ability to respond appropriately to changes in the work setting.  (Id.)

## The ALJ's Decision

The ALJ first determined that Plaintiff had not engaged in substantial gainful activity since applying for SSI. (Id. at 12.) The ALJ next found that Plaintiff had severe impairments of depression and PTSD. (Id.) As of October 29, 2011, she also had degenerative disc disease of the lumbar spine with protruding disc at L5-S1. (Id.) She had had alcoholism, but it was not severe for the period between her application date and November 2010, when she stopped drinking. (Id. at 13.) The dislocations of her shoulders were not severe. (Id.) Additionally, the dislocation of her left shoulder was not supported by the medical records. (Id.)

The ALJ next determined that Plaintiff did not have an impairment or combination thereof that met or medically equaled an impairment of listing-level severity. (Id.) She had mild restrictions in her activities of daily living and moderate difficulties in social functioning and in concentration, persistence, or pace. (Id.) She had not had any episodes of decompensation of extended duration. (Id.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with non-exertional restrictions of being limited to unskilled simple routine tasks, dealing primarily with things rather than people, and occasionally relating to co-workers and supervisors. (Id. at 14.) After October 2011, she had an additional restriction of being limited to sedentary work. (Id.) After summarizing the record, the ALJ noted that no treating or examining doctor had opined that Plaintiff was unable to work; that there were no medical records of a left shoulder impairment although

Plaintiff alleged frequent problems with that shoulder dislocating; and that she did not complain of any back pain until her motor vehicle accident. (Id. at 14-17.) She had been restricted in her ability to work because of her emotional condition, but no treating source had opined that this condition precluded all full-time work. (Id. at 17.) After October 2011, she was limited to sedentary work due to her back condition. (Id. at 17-18.) The ALJ also considered the lack of a good work history, noting that Plaintiff had earned more than $5,000 in only one year, and that was in 2004 when she earned $7,870.22. (Id. at 18.) No treating source had reported that she had any symptoms of disabling severity. (Id.) Plaintiff told Dr. Robinson she went to church; however, when testifying she stated she only went to AA meeting. (Id.) She testified that she sometimes did not get out of bed for days; however, her friend reported they watched television together daily. (Id.)

With her RFC, Plaintiff could not perform any past relevant work. (Id.) With her age, education, and RFC, she could perform the jobs described by the VE. (Id. at 19-20.) She was not disabled within the meaning of the Act. (Id. at 20.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months. **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002). Additionally, the

impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  <u>See</u> 20 C.F.R. § 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  <u>See</u> 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  <u>See</u> 20 C.F.R. § 416.1520(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523. "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

In determining a claimant's RFC, "'the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires that the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the *Polaski* factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to her past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547

F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones v. Astrue**, 619 F.3d 963, 968 (8th Cir. 2010); **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

### Discussion

Plaintiff argues that the ALJ erred by (1) not basing his RFC findings on any medical evidence and (2) not including the concrete consequences of her impairments in the hypothetical question posed to the VE.

"The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,' despite his or her physical or mental limitations." **Roberson v. Astrue**, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996)); accord **Masterson v. Barnhart**, 363 F.3d 731, 737 (8th Cir. 2004); **Depover v. Barnhart**, 349 F.3d 563, 567 (8th Cir. 2003). "When determining a claimant's RFC, the ALJ must consider all relevant evidence, including the claimant's own description of her or his limitations, as well as medical records, and

observations of treating physicians and others." **Roberson**, 481 F.3d at 1023. See also Social Security Ruling 96-8p, 1996 WL 374184 at *5 (listing factors to be considered when assessing a claimant's RFC, including, among other things, medical history, medical signs and laboratory findings, effects of treatment, medical source statements, recorded observations, and "effects of symptoms . . . that are reasonably attributed to a medically determinable impairment"). As correctly noted by Plaintiff, "a claimant's RFC is a medical question and 'at least some' medical evidence must support the ALJ's RFC determination." **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010). "Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively." **Cox v. Astrue**, 495 F.3d 614, 619 (8th Cir. 2007). Additionally, an ALJ does not fail in his duty to assess a claimant's RFC merely because the ALJ does not address all areas regardless of whether a limitation is found. See **Depover**, 349 F.3d at 567. Instead, an ALJ who specifically addresses the areas in which he found a limitation but is silent as to those areas in which no limitation is found is believed to have implicitly found no limitation in the latter. **Id.** at 567-68.

After reviewing the record, including Plaintiff's medical records, and assessing her credibility,[20] the ALJ determined that, until her motor vehicle accident in October 2011, Plaintiff had the RFC to perform a full range of work at all exertional levels with non-exertional restrictions of being limited to unskilled simple routine tasks, dealing primarily with things rather than people, and occasionally relating to co-workers and supervisors. After October 2011, she had an additional restriction of being limited to sedentary work.

---

[20]The Court notes that Plaintiff does not challenge the ALJ's assessment of her credibility.

The only physical impairment cited by Plaintiff when applying for SSI was a dislocated right shoulder. She sought emergency treatment for a dislocated right shoulder eleven months before applying for SSI. The dislocation was easily corrected. Plaintiff did not follow-up with Dr. Crane as instructed, never sought a renewal of the prescription given her on discharge, and did not seek medical attention again for a dislocated right shoulder. During her testimony, she cited a dislocated left shoulder as a reason for her inability to work. There are no records of her seeking treatment for the left shoulder.

Plaintiff also cited depression in her application and in her testimony as a reason she cannot work. The first mention of depression in the medical records is an observation in February 2010 when she sought emergency treatment for a headache that she appeared to be severely depressed. Even so, she was oriented to person, place, and time and did not display any inappropriate behavior. Seven months later, when being evaluated by Dr. Robinson, Plaintiff identified depression as the primary reason she could not work. Dr. Robinson rated her GAF as being 75, indicative of transient symptoms at most and no more than a slight impairment in functioning. The only record of her receiving treatment for her depression is in January 2011. That record includes observations of Plaintiff having good grooming and hygiene, adequate insight and judgment, and a pleasant and cooperative demeanor. In response to being informed she needed counseling, she replied that she was receiving it from a different provider; however, there is no record of such counseling. Despite the paucity of records supporting Plaintiff's claim of disabling depression, after reviewing Plaintiff's

testimony and the medical records, the ALJ did incorporate several non-exertional limitations in his RFC findings.

Plaintiff also cited back pain as a disabling impairment. She first sought treatment for non-headache pain sixteen months after applying for SSI, reporting she had been diagnosed with sciatica after being in a motor vehicle accident the month before. When doing so, she also requested a physical for work. The next month she saw Dr. Padda for left leg and buttock pain. Although she had been diagnosed when given a selective root block injection with five back-related impairments, i.e., lumbosacral spondylolysis without myelopathy; lumbar disc displacement; degenerative disc disease; lumbar radiculopathy; and back pain/lumbago , after the third such injection and one epidural steroid injection, Plaintiff's only diagnosis was lumbosacral spondylolsis without myelopathy. Even so and without any emergency room or medical records reflecting treatment for injuries sustained in a motor vehicle accident, the ALJ limited Plaintiff after October 2011 to sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time . . . . Jobs are sedentary if walking and standing are required occasionally." 20 C.F.R. § 416.967(a). Sedentary work is the least exertional. See 20 C.F.R. § 416.927.

Thus, after reviewing the entire record, including Plaintiff's testimony and the medical records, the ALJ determined her RFC. As noted above, it is Plaintiff's burden to prove her RFC, see **Moore**, 572 F.3d at 523, and her failure to provide any medical evidence of a more restrictive RFC does not undermine the support in the record for the ALJ's RFC findings. See **Zeiler v. Barnhart**, 384 F.3d 932, 936 (8th Cir. 2004) (rejecting claimant's argument that the

ALJ had not based his RFC finding on any medical evidence; issue was not that ALJ substituted his opinion for that of treating physician but that the only medical opinion in record did not support claimant's description of her RFC).

Plaintiff further argues that, because of the ALJ's erroneous RFC findings, his hypothetical question to the VE did not capture the concrete consequences of her impairments.

"'The ALJ's hypothetical question to the [VE] needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1067 (8th Cir. 2012) (quoting Martise, 641 F.3d at 927). The question need not incorporate additional limitations properly disregarded by the ALJ. **Id.** Such limitations did not include those based on a claimant's discounted subjective complaints and those based on medical opinions that the ALJ has not given controlling weight. **Id.** Accord **Perkins v. Astrue**, 648 F.3d 892, 902 (8th Cir. 2011); **Heino v. Astrue**, 578 F.3d 873, 882 (8th Cir. 2009). In the instant case, the ALJ posed a hypothetical question to the VE that encompassed the concrete consequences of the impairments he found to be supported by substantial evidence on the record as a whole. The question was, therefore, proper.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome,

or because [the Court] would have decided differently." **Wildman**, 596 F.3d at 964.

Accordingly, for the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this _25th_ day of June, 2014.